2001 WY 90

**STATE of Wyoming, et al., Appellants (Defendants),**

v.

**CAMPBELL COUNTY SCHOOL DISTRICT, et al., Appellees (Plaintiffs),**

**Laramie County School District No. One, et al., Appellees (Intervening Plaintiffs),**

and

**Wyoming Education Association, Appellee (Intervening Plaintiff).**

No. 00–120.

Supreme Court of Wyoming.

Oct. 2, 2001.

---

Representing Appellants: Rowena Heckert, Deputy Attorney General; Raymond B. Hunkins, Special Assistant Attorney General, of Jones, Jones, Vines & Hunkins, Wheatland, WY; and Jack B. Speight and Dominique D.Y. Cone of Hathaway, Speight & Kunz, LLC, Cheyenne, WY. Argument by Mr. Hunkins.

Representing Appellee Laramie County School District No. One: Paul J. Hickey and Richard D. Bush of Hickey, Mackey, Evans & Walker, Cheyenne, WY. Argument by Mr. Hickey.

Representing Appellee Natrona County School District No. One: Stuart R. Day and Kevin D. Huber of Williams, Porter, Day & Neville, P.C., Casper, WY. Argument by Mr. Day.

Representing Appellee Wyoming Education Association: Patrick E. Hacker of Patrick E. Hacker, P.C., Cheyenne, WY. Argument by Mr. Hacker.

Before LEHMAN, C.J., and GOLDEN, KITE, and VOIGT, JJ., and SPANGLER, D.J., Ret.

On Rehearing

LEHMAN, Chief Justice.

[¶ 1]   In 1995, this court heard school districts' claims challenging the constitutionality of school financing statutes. This court determined the Wyoming Constitution required that all students receive an equal opportunity to a quality education. Finding a lack of equal opportunity, we remanded the case. *Campbell County Sch. Dist. v. State,* 907 P.2d 1238 (Wyo.1995) (*Campbell I*). After the legislature acted, the challenger school districts and the Wyoming Education Association (WEA) continued the action, culminating in a second opinion by this court in which we again decided issues involving the constitutionality of operations and capital construction financing. *State v. Campbell County Sch. Dist.,* 2001 WY 19, 19 P.3d 518 (Wyo.

2001) (*Campbell II* ). From this second opinion, the State petitioned for rehearing. The petition indicated an interpretation of our decision not intended by this court regarding the issue of capital construction. We heard oral argument by the State, Laramie County School District Number One, Natrona County School District Number One, and WEA.

[¶ 2] At oral argument upon the Petition for Rehearing, all parties agreed that the present method for financing capital construction is not constitutional, and further agreed that capital construction financing cannot be based upon local wealth, but must be based upon the wealth of the state as a whole. Although our opinion on the adequacy of capital construction funding did not draw the same agreement by the parties, no one disputes that inadequate funding causes serious damage to school districts' ability to deliver a constitutional education to the children of this state. Until a comprehensive plan exists to adequately fund capital construction from the wealth of the state as a whole, the students of all school districts remain subject to injuries and damages.

[¶ 3] The following issues were raised in the Petition for Rehearing to which the court now responds.

***Taking Judicial Notice of Incomplete Documents***

[¶ 4] The legislature ordered the state superintendent to establish the needs of "school buildings and facilities" on or before September 1 of each year. Wyo. Stat. Ann. § 21–15–107(e) (Lexis 1999). On or before October 1 of each year, the state superintendent reports those needs to the Joint Education Interim Committee, and, "[n]ot later than December 31 of each year," the state superintendent is to report on the "progress being made" on capital construction projects. Wyo. Stat. Ann. § 21–15–107(e), (g), (j) (Lexis 1999). In *Campbell II,* the court took judicial notice of a document entitled "November 2000–Schools in Immediate Need of Capital Construction" and, in doing so, omitted a final column. Although the State disputes both the propriety of our use of the state superintendent's November 2000 report and the accuracy of our interpretation, we

assure the State that we did consider the last column of that report as noted in footnote 57 of our opinion.

[¶ 5] As statutorily required, the MGT study was the method employed to assess "school buildings and facilities" in accordance with Wyo. Stat. Ann. § 21–15–111 (Lexis 1999), a statute entitled "State capital construction assistance." Our opinion requires completion of the capital construction projects identified in the MGT study and recognizes the total amount will fluctuate for various reasons. The State contends substantial funds have been provided for which it was not given credit by this court's opinion, including major maintenance funding. Those appropriations were not proposed until after our opinion was issued. Obviously, any funds appropriated for capital construction projects will reduce the ultimate state-funding obligations. Therefore, the State need not believe that it has been mandated to spend a fixed amount without regard to ongoing progress. In addition, some of the funds the State points to are currently encumbered until such time as the legislature conducts its own separate review of the proposed projects. Accordingly, this court will not consider the funds until they are available to be spent.

***Consequences of Inadequacy***

[¶ 6] Before we again focus on methodology details, it cannot be forgotten why, since 1981, we have found that capital construction financing critically impacts the quality of education. Without adequate funding for costly repairs, renovations, and building construction, school districts faced with non-routine major expenditure items must choose from the lesser of two evils: either ignoring the problem or, if that is no longer an option, diverting operational funding intended for teachers' and staff salaries and essential school programs. If the schools' operational funding budgets have no surplus money to divert, a deficiency results and educational staff and programs are eliminated to reduce expenditures. At the same time, it is rare that these extraordinary efforts are sufficient to properly maintain buildings.

[¶ 7] Our 1995 opinion found the challenger school districts had proved that the cumulative effect from years of diverting and cutting operational funding had forced untenable staff and program cuts while failing to prevent the deterioration and overcrowding of school buildings. Consequently, school districts were unable to provide to all students in this state a sufficient number of teachers and buildings to maintain small class size, sufficient programs necessary to deliver a proper education, and assurance that all buildings met basic safety standards. Since 1995, the legislature has comprehensively addressed school districts' operational funding issues, but not capital construction deficiencies. Unless the two parts of the whole are simultaneously remedied, the unconstitutionality of the system is not eliminated.

### Relying Upon Scores of 90

[¶ 8] The constitutional goal is to ensure adequate capital construction funding from state wealth. In 1999, the legislature enacted statutes creating a school capital construction system in response to our decision in *Campbell I*. 1999 Wyo. Sess. Laws ch. 170, §§ 101, 102. Entitled "Capital Construction Projects," the statutes were separate from those statutes governing school operations finance. Wyo. Stat. Ann. §§ 21–15–106 through 112 (Lexis 1999). This set of capital construction statutes constituted the legislative plan to identify and separately fund capital construction needs.

[¶ 9] State officials identified "inadequate and immediate need" buildings and facilities by means of a scoring system. However, within the State's scoring system capital construction projects were not limited to those falling into the "inadequate and immediate need" category. The legislative plan limited eligibility for state funding to those school buildings and facilities that had been identified as "inadequate" and "in need of immediate capital construction." Wyo. Stat. Ann. § 21–15–107(e) (Lexis 1999). We have agreed that the State's scoring methodology was constitutional and accordingly ruled that a legislative plan that limited assistance to the worst buildings unconstitutionally failed to provide for completing all capital construction projects identified by the scoring system.

[¶ 10] There is no serious dispute from any party that inadequate funding impedes school districts' ability to deliver a constitutional education to our children. Subsequent to our 1995 opinion, the legislature acknowledged this premise by enacting legislation ordering evaluation of all school buildings through the use of "qualified contractor assistance." Wyo. Stat. Ann. § 21–15–107(b) (Lexis 1999). From this directive, the legislature's capital construction project identification method was formulated under the MGT study. The MGT study developed a scoring system and then assigned score ranges to categories.

[¶ 11] In this matter on reconsideration, the State now alleges the court overstepped its authority by relying upon the MGT study, suggesting the study does not represent proposed legislative action, but merely guidelines for the legislature to consider. However, the MGT study was the *only* piece of evidence regarding capital construction needs submitted by the State during the trial. Furthermore, there was no argument presented to this court prior to the most recent funding opinion that indicated the study would not be used for legislative decision making. In fact, in addition to the legislation itself, the rules of the DOE rely upon the scoring system as a measure for its actions. Therefore, this court also relied upon the study. In this instance, the study created a mechanism for the State itself to determine if funding of capital construction meets constitutional standards, and we have no alternative but to rely on it and to respond to its results.

[¶ 12] In developing the scoring system, the MGT study began by distinguishing "capital construction projects" from "routine maintenance," and then assigned a numerical score which had the effect of categorizing or, as the State says, prioritizing. Because routine maintenance was funded through a school's operations budget, while capital construction projects were to be separately funded, it was essential to begin by identifying those needs not presently funded. In

addition to new capital construction, projects included non-routine items that the MGT identified as deferred maintenance repairs and replacement, and all were scored and categorized.

[¶ 13] The critical aspect, however, was the score. The higher the score, the closer the building was to changing its designation from a "capital construction project" to a condition requiring only "routine maintenance"—the obvious goal. By definition then, and without regard to whether new construction, a repair, a replacement, or a renovation is required, scores below 90 indicate that a non-routine, major expenditure is needed. Thus, it is a capital construction project to be addressed by the legislature's separate statutory scheme.

[¶ 14] As a point of clarification, the score of 90 categorizing the building as "new or as new," simply meant that the building condition was such that it required only routine maintenance. The State, the legislature, school districts, and citizens can rest assured that our opinion, in no way, required the construction of entirely new buildings for every building which scores below 90.

[¶ 15] As to the score of 90, the court is cognizant of the fact that future studies could utilize different methodologies to measure capital construction needs. The second point of clarification, therefore, is that the test of whether capital construction funding is needed must be whether the facilities are in a condition where only routine maintenance is required.

[¶ 16] *Campbell II* adopted the goal that, using the currently accepted MGT system, all buildings should ultimately be able to achieve a score of 90 for building condition, 80 for educational suitability and technological readiness, and 4 for building accessibility. These numbers were obtained from the State's MGT report. In addition, the opinion concluded that buildings that did not meet the state standards for square footage would be deemed "in immediate need." We remain committed to that goal for all school buildings and to *Campbell II's* requirement for a legislative plan within six years to achieve that goal for the long term. *Campbell County Sch. Dist.*, 2001 WY 19, ¶ 137, 19 P.3d 518, ¶ 137.

[¶ 17] We conclude a clarification of those goals is appropriate. That plan should include a mechanism to fund non-routine maintenance to prevent buildings from deteriorating to a condition deemed inadequate. The State's own regulations define buildings in "immediate need" as those with scores below 49 in building condition, having a condition which creates a major or critical health hazard, or having a condition which prohibits activities essential to the educational program. Department of Education School Capital Construction Grants, Building Maintenance and Repair Programs, ch. 24, § 3(i) (2/23/00). It cannot be responsibly argued that facilities in immediate need should not be remedied as quickly as possible. *Campbell II* required this funding be provided (not projects completed) within two years, and we confirm that requirement. The statutes and regulations do not specifically categorize buildings which fall below the minimum square footage standards adopted by the State. Obviously, buildings which are overcrowded, where the cause of the overcrowding is not short term, prohibit the school's ability to deliver the educational services deemed appropriate by the legislature. Consequently, the State must consider chronically overcrowded buildings as in immediate need.

[¶ 18] The State's own regulations then define "inadequate" buildings as those falling below a score of 69 for condition, educational suitability, or technology readiness and which have a condition(s) that impedes the delivery of educational services. Department of Education School Capital Construction Grants, Building Maintenance and Repair Programs, ch. 24, § 3(j) (2/23/00). Allowing schools to have inadequate facilities cannot meet the constitutional standard set forth in *Campbell I* of elimination of deficient facilities. *Campbell II* required inadequate facilities be remedied within four years, and we continue to believe that is appropriate.

[¶ 19] During argument, the State indicated it was on schedule as outlined in our previous opinion, and we see no compelling reason to alter that schedule. We are aware

significant funds have been appropriated and numerous projects are in various stages of planning, development, and state approval. Thus, the estimated project costs contained in the MGT report are outdated and are an inaccurate indication of the final costs.

[¶ 20] Critical to this issue on rehearing is the recognition that the State is in control of the ultimate amount of spending as it exercises its responsibility of review and oversight of specific projects proposed by local school districts. The constitution simply requires the State to provide capital construction funding of the facilities in the amount deemed necessary to provide facilities capable of delivering the level of educational services determined appropriate by the State of Wyoming. If a local school district seeks funding in excess of that required to meet state standards, the State is not obligated to provide such funding, and the local school district can seek it from other sources. For example, if a school district proposes to build a new high school for $30 million dollars and the State determines it is able to build a school capable of delivering the educational services required by their standards for $20 million dollars, then the State is obligated to spend only $20 million dollars, and the school district must provide funding for that part of the proposal in excess of constitutional state standards.

### Which Buildings Apply

[¶ 21] The State seeks clarification of which buildings need to be included in the capital construction funding scheme. The legislative directive in § 21–15–111(a)(iii) defines "school buildings and facilities" as "the physical structures and the land upon which the structures are situated, which are primarily used in connection with or for the purpose of providing the educational programs offered by a school district in compliance with law, including *both student-related and nonstudent-related buildings and facilities.*" (Emphasis added.)

[¶ 22] The court finds the legislation to be sufficiently clear and would expect the legislature and the school districts to employ common sense in its application. Clearly, buildings used to educate students should take priority in terms of capital construction financing. However, the legislature wisely included an ongoing review of all buildings, and wisdom teaches us all that an ounce of prevention is worth a pound of cure.

### Construction Infrastructure

[¶ 23] The State asked the court to consider its capital construction obligations in light of our state's inability to complete the projects because of a dearth of contractors and labor. Just as with any other litigant before this court, we are unable to rely upon evidence not submitted in the course of trial. Further, it would appear this issue is premature for the court to make subject of an opinion.

### Summary of Issues Raised on Rehearing

[¶ 24] In summary, capital construction funding must continue within the time frame set forth in the *Campbell County II* opinion, with the goal to achieve facilities that need only routine maintenance.

### Uniform Taxation

[¶ 25] Our recent opinion noted that capital construction funding primarily relied upon non-uniform property taxation. The court again advised the legislature of the option of statewide taxation as an alternative method of obtaining capital construction revenues, just as we have since 1971. Despite voiced concerns that the court overstepped its bounds by ordering statewide taxation, clearly our opinion contained no such order. In fact, we stated:

> To date, the Wyoming legislature has limited school funding taxation to property taxes although nothing prohibits it from imposing other taxation or revenue raising mechanisms. That decision, however, is the prerogative of the legislature.

*State v. Campbell County Sch. Dist.,* 2001 WY 19, ¶ 123, 19 P.3d 518, ¶ 123. We went on to say that:

> The Wyoming Constitution does not prohibit the state from imposing a statewide mill levy taxation level for capital construction, nor does it limit the number of mills that can be levied for such a fund. It

merely requires that it be uniform. Nothing in the state constitution prevents the legislature from raising the entire amount needed of more than $565 million for capital construction by enacting statutes imposing a new category of statewide mill levy for capital construction at whatever level is required to raise the desired amount of money, and, *if it so desires,* the legislature can act within any time frame including raising all funding in a single year.

*Id.* at ¶ 127, 19 P.3d 518 (emphasis added and citations omitted).

### Bonding and Local Revenues

██ [¶ 26] We agree with WEA that we must clarify that, from the date of our opinion, all bonds in place remain in effect. However, school districts are no longer required to have reached bonded indebtedness of ninety percent (90%) or more of their constitutional debt limitation imposed under Wyoming Constitution, art. 16, § 5 in order to receive state assistance for those capital construction projects identified in the MGT study. In *Campbell II,* we held that the legislature unconstitutionally relied upon local wealth by requiring local school districts to resort first to local resources for capital construction and to bond to ninety percent (90%) of their capacity before becoming eligible for state funding. Wyo. Stat. Ann. § 21–15–111(e) (Lexis 1999).

[¶ 27] Our decisions have neither eliminated nor reduced "local control" as it exists today. On the contrary, we have recognized a school district's right to rely upon some local funding to serve the purpose of improving the quality of education delivered to its students through innovation or modernization. The Wyoming Constitution permits school districts to impose bonded indebtedness up to a set limit. We have decided that the State cannot take this money from a local school district for any purpose.

### Continuing Jurisdiction

[¶ 28] Historically, and perhaps with even more justification in the present setting, the court has been reluctant to remain involved in ongoing disputes. The purpose for that is our recognition that we are not charged with developing policy or making funding decisions. However, all parties have requested that this court retain jurisdiction. While it is our expectation that our continued jurisdiction will not be necessary, we will accept petitions for resolution of constitutional or statutory interpretations should the parties reach an impasse. It is our expectation that all parties will act in good faith in all matters including requesting or agreeing to any requests for extensions under our previously announced time frames. Finally, the court will consider the appropriateness of appointing a special master in the future should the parties be unable to resolve ongoing disputes.

### Separation of Powers

[¶ 29] This court remains acutely aware of the criticism surrounding the two most recently issued opinions regarding school financing. While all parties now acknowledge that the current method for financing capital construction is unconstitutional, the court's discussion of the funding issues surrounding capital construction was viewed as crossing the lines separating our branches of government in Wyoming.

[¶ 30] We continue to recognize that it is our duty to declare void all legislation that is unconstitutional. In 1787, Alexander Hamilton stated that it is the duty of courts of justice to declare void all legislative acts contrary to the manifest tenor of the constitution. In *The Federalist* No. 78,[1] Alexander Hamilton described this doctrine to be "of great importance in all the American constitutions," and spoke to "[s]ome perplexity" that had "arisen from an imagination that the doctrine would imply a superiority of the judiciary to the legislative power." Hamilton removed the perplexity in his cogent explanation of the doctrine:

There is no position which depends on clearer principles, than that every act of a delegated authority, contrary to the tenor of the commission under which it is exercised, is void. No legislative act, therefore, contrary to the constitution, can be valid.

---

1. *The Federalist* No. 78, at 577–78 (Alexander Hamilton) (John C. Hamilton ed. 1880).

To deny this, would be to affirm, that the deputy is greater than his principal; that the servant is above his master; that the representatives of the people are superior to the people themselves; that men, acting by virtue of powers, may do not only what their powers do not authorize, but what they forbid.

If it be said that the legislative body are themselves the constitutional judges of their own powers, and that the construction they put upon them is conclusive upon the other departments, it may be answered, that this cannot be the natural presumption, where it is not to be collected from any particular provisions in the constitution. It is not otherwise to be supposed, that the constitution could intend to enable the representatives of the people to substitute their *will* to that of their constituents. It is far more rational to suppose, that the courts were designed to be an intermediate body between the people and the legislature, in order, among other things, to keep the latter within the limits assigned to their authority. The interpretation of the laws is the proper and peculiar province of the courts. A constitution is, in fact, and must be, regarded by the judges as a fundamental law. It must therefore belong to them to ascertain its meaning, as well as the meaning of any particular act proceeding from the legislative body. If there should happen to be an irreconcilable variance between the two, that which has the superior obligation and validity ought of course, to be preferred; or in other words, the constitution ought to be preferred to the statute, the intention of the people to the intention of their agents.

Nor does the conclusion by any means suppose a superiority of the judicial to the legislative power. It only supposes that the power of the people is superior to both; and that where the will of the legislature declared in its statutes, stands in opposition to that of the people declared in the constitution, the judges ought to be governed by the latter, rather than the former. They ought to regulate their decisions by the fundamental laws, rather than by those which are not fundamental.

These truths of which Hamilton spoke found expression in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803), and most state courts, including Wyoming's, have followed this judicial path.

[¶ 31] Our school finance decisions are the natural result of our understanding and application of the immutable truths of which Hamilton spoke. They have been firmly and faithfully anchored in the plain language of the Wyoming Constitution, a fundamental law established by and expressing the will of the people. Because it falls to us to preserve, protect, and defend the people's fundamental law, we cannot declare valid any legislation which contravenes that fundamental law. To deny this would be to affirm that the people's representatives in the legislature are superior to the people. Where the will of the legislature declared in its school finance statutes stands in opposition to the will of the people declared in their Wyoming Constitution, we are, and must be, governed by the will of the people.

[¶ 32] While we recognize the legislative and executive branches of Wyoming's state government have broad powers and responsibilities in providing the fundamental right of an education to our children, the powers of each branch of government are bound by the mandates and the constraints of the Wyoming Constitution. "If the executive and legislative branches fail to fulfill their duties in a constitutional manner, the Court too must accept its continuing constitutional *responsibility* ... for overview ... of compliance with the constitutional imperative." *Unfulfilled Promises: School Finance Remedies and State Courts*, 104 Harv. L.Rev. 1088 (1991).

[¶ 33] For thirty years, this court has witnessed the legislature struggle with capital construction issues. Our decisions attempted to provide a framework within which the legislature could achieve a constitutional school financing scheme. However, consistent reiteration of constitutional requirements has proved to be ineffective. The legislature's failure to create a timely remedy consistent with constitutional standards justifies the use of provisional remedies or other equitable powers intended to spur action.

*Unfulfilled Promises: School Finance Remedies and State Courts,* 104 Harv. L.Rev. 1086. When insufficient action in the legislative process occurs, judicial monitoring in the remediation phase can help check political process defects and ensure that meaningful relief effectuates the court's decision. *Id.* at 1087. When these defects lead to continued constitutional violations, judicial action is entirely consistent with separation of powers principles and the judicial role.

> "An active judicial role in monitoring remedy formulation is well-rooted in the courts' equitable powers."[2] ... How long a court waits and the degree of intervention exercised will depend upon the facts, such assessments fall squarely within the court's expertise. But staying the judicial hand in the face of continued violation of constitutional rights makes the courts vulnerable to becoming complicit actors in the deprivation of those rights.

*Id.*

■ [¶ 34] Considerations of time and space restrain us from undertaking anything more than an abbreviated and measured response to the view of the dissent that the school finance issues are nonjusticiable political questions which this court should refrain from deciding and leave to the legislature. It asserts that in neither *Campbell I,* our 1995 decision, nor in the instant case, which flows from the earlier case, has this court explained why the matter is not a nonjusticiable political question. More specifically, the dissent focuses the debate on the political question doctrine and mechanically draws on and applies two of six attributes of federal political question doctrine identified in *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962), a federal legislative apportionment case in Article III federal courts. The United States Supreme Court there held that the legislative apportionment matter before the federal court was not a nonjusticiable political question. So applying this federal nonjusticiability doctrine, which is of questionable currency as shall be seen,

the dissent concludes that this purely state matter is a nonjusticiable political question. There are a number of sound reasons why the federal political question doctrine does not apply here and why this court has not adopted a stance toward that issue.

[¶ 35] First and foremost, in the *Campbell* litigation the State has never raised or briefed the so-called political question issue. One can scour the State's briefs and oral arguments in these cases, including the instant rehearing, and not find reference to either that discrete doctrine or *Baker,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663. Under this court's long-standing precedent, this court will not frame the issues for the litigants and will not consider issues not raised by them and not supported by cogent argument and authoritative citation.

[¶ 36] Moreover, *Baker* is clearly irrelevant and inapplicable for purposes of state constitutional analysis. The case was decided in 1962, during a time in this nation's history when racial discrimination and malapportionment of representative districts at local, state, and federal levels were two of many causes of inequity in voting patterns across the nation. These causes effectively diluted the voting power of new interest groups and, in many instances, numerical majorities. Some held the view that legislative malapportionment was a political question and courts should not be involved in the "political thicket" surrounding apportionment problems. In *Baker,* an action filed under the federal civil rights act, the plaintiffs claimed that a Tennessee apportionment statute debased their votes and denied them the equal protection of the laws guaranteed them under the federal constitution. The federal district court dismissed the action, holding that the subject matter of the action was not justiciable and the claim not legally cognizable. On certiorari to the United States Supreme Court, Justice William J. Brennan, Jr., on behalf of the Court, focused on the lower court's misunderstanding that

---

**2.** *Swann v. Charlotte–Mecklenburg Bd. of Educ.,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for

breadth and flexibility are inherent in equitable remedies"). *See also Hutto v. Finney,* 437 U.S. 678, 687–88, 98 S.Ct. 2565, 2571–72, 57 L.Ed.2d 522 (1978).

because the plaintiffs sought to have a legislative apportionment declared unconstitutional, their action presented a nonjusticiable political question. The Court reversed the lower court's decision, holding that the apportionment challenge presented no nonjusticiable political question. In the course of Justice Brennan's discussion, he reviewed a number of federal political question cases "to expose the attributes of the doctrine—attributes which, in various settings, diverge, combine, appear, and disappear in seeming disorderliness." 369 U.S. at 210, 82 S.Ct. at 706. He emphasized that his review was "undertaken solely to demonstrate that neither singly nor collectively do these cases support a conclusion that this apportionment case is nonjusticiable, [and] we of course do not explore their implications in other contexts." *Id.* His review revealed that the relationship giving rise to the political question "is the relationship between the judiciary and the coordinate branches of the Federal Government, and not the federal judiciary's relationship to the States...." *Id.* He also stressed that "[d]eciding whether a matter has in any measure been committed by the [Federal] Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution." *Id.* at 211, 82 S.Ct. at 706. With respect to the attribute of "lack of judicially discoverable and manageable standards," which his review had identified, *id.* at 217, 82 S.Ct. at 710, he observed that "[j]udicial standards under the Equal Protection Clause are well-developed and familiar...." *Id.* at 226, 82 S.Ct. at 715.

[¶ 37] The federal doctrine of nonjusticiable political question, as discussed and applied in *Baker* and later federal decisions, has no relevancy and application in state constitutional analysis. For example, Justice Brennan himself wrote in 1977:

> And of course state courts that rest their decisions wholly or even partly on state law need not apply federal principles of standing and justiciability that deny litigants access to the courts.

> . . . .

> ... [D]ecisions of the [United States Supreme] Court are not, and should not be, dispositive of questions regarding rights guaranteed by counterpart provisions of state law. Accordingly, such decisions are not mechanically applicable to state law issues, and state court judges and the members of the bar seriously err if they so treat them.

William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights,* 90 Harv. L.Rev. 489, 501–02 (1977).

[¶ 38] Leading scholars debate whether the political question doctrine even exists, its wisdom and validity, and its scope and rationale. *See, e.g.,* Alexander M. Bickel, *The Supreme Court, 1960 Term—Forward: The Passive Virtues,* 75 Harv. L.Rev. 40 (1961); Gerald Gunther, *The Subtle Vices of the "Passive Virtues"—A Comment on Principle and Expediency in Judicial Review,* 64 Colum. L.Rev. 1 (1964); Louis Henken, *Is There a "Political Question" Doctrine?* 85 Yale L.J. 597 (1976) (Henken was a law clerk to Justice Frankfurter and a constitutional scholar of the highest stature); Martin H. Redish, *Judicial Review and the "Political Question,"* 79 Nw. U. L.Rev. 1031 (1985); Linda Sandstrom Simard, *Standing Alone: Do We Still Need the Political Question Doctrine?* 100 Dick. L.Rev. 303 (1996); Herbert Wechsler, *Toward Neutral Principles of Constitutional Law,* 73 Harv. L.Rev. 1, 6–9 (1959).

[¶ 39] Another constitutional scholar of high stature observes several ways in which "the political question doctrine is the most confusing of the justiciability doctrines." Erwin Chemerinsky, *Federal Jurisdiction* 142 (Little, Brown and Co., 2d ed.1994). He states:

> First, the confusion stems from the fact that the political question doctrine is a misnomer; the federal courts deal with political issues all of the time....

> Second, the political question doctrine is particularly confusing because the [United States Supreme] Court has defined it very differently over the course of American history.

> . . . .

Finally, and perhaps most importantly, the political question doctrine is confusing because of the [United States Supreme] Court's failure to articulate useful criteria for deciding what subject matter presents a nonjusticiable political question. The classic, oft-quoted, statement of the political question doctrine . . . provided in *Baker v. Carr* . . . seem[s] useless in identifying what constitutes a political question. *Id.* at 143–45. Explaining this third point, Professor Chemerinsky writes:

> For example, there is no place in the [Federal] Constitution where the text states that the legislative or executive should decide whether a particular action constitutes a constitutional violation. The [Federal] Constitution does not mention judicial review, much less limit it by creating "textually demonstrable commitments" to other branches of government. Similarly, most important constitutional provisions are written in broad, open-textured language and certainly do not include "judicially discoverable and manageable standards." . . . .
>
> In other words, it is impossible for a court or a commentator to apply the *Baker v. Carr* criteria to identify what cases are political questions. As such, it hardly is surprising that the doctrine is described as confusing and unsatisfactory.

*Id.* at 145. Professor Chemerinsky and other critics of the doctrine conclude that it "should play no role whatsoever in the exercise of the judicial review power." *Id.* at 147 (quoting Martin Redish, *Judicial Review and the "Political Question,"* 79 Nw. U. L.Rev. 1031, 1033 (1985); *see also* Erwin Chemerinsky, *Interpreting the Constitution* 99–105 (1987)).

[¶ 40] Closer to home, Professor Robert B. Keiter, formerly at the University of Wyoming College of Law and a respected Wyoming state constitutional law scholar, has made a forceful case against the separation-of-powers objection contained in the various nonjusticiability doctrines, such as standing and political question. *See,* Robert B. Keiter, *An Essay on Wyoming Constitutional Interpretation,* 21 Land & Water L.Rev. 527 (1986). He has described in detail the significant institutional differences between the Article III federal courts and the state courts which justify a more expansive judicial review role for Wyoming's courts on public law issues than is appropriate for the federal courts. His concern, which we share, is that as these doctrines develop they should be clearly related to the Wyoming Constitution rather than the federal charter. *Id.* at 541. In the state constitutional law context, Professor Keiter is not alone. *See, e.g.,* Helen Hershkoff, *State Courts and the "Passive Virtues": Rethinking the Judicial Function,* 114 Harv. L.Rev. 1834 (2001) ("[S]tate courts, because of their differing institutional and normative position, should not conform their rules of access to those that have developed under Article III. Instead, state systems should take an independent and pragmatic approach to judicial authority in order to facilitate and support their integral and vibrant role in state governance." *Id.* at 1941). It should probably not go unnoticed that Professor Michael Heise, whose law review article on Wyoming's school finance litigation is cited by the dissent, has spoken on the point when he concludes in that article: "[M]y impression is that the weight of scholarly and judicial opinion on this issue decidedly favors the conclusion reached by the Wyoming [Supreme] Court in *Campbell.*" Michael Heise, *Schoolhouses, Courthouses, and Statehouses: Educational Finance, Constitutional Structure, and the Separation of Powers Doctrine,* 33 Land & Water L.Rev. 281, 304 n. 141 (1998).

[¶ 41] Although what we have said to this point should end the matter, let us briefly take one more step and discuss the conclusion in the dissent that judicially discoverable and manageable standards do not exist in the education provisions of the Wyoming Constitution. Relying largely on a few dissenting opinions from school finance cases in Ohio, Washington, and South Carolina, and without the benefit of a state constitutional analysis, the dissent describes the words of the framers and ratifiers contained in these provisions as "amorphous," concluding apparently that they have no meaning and express no principles. One need only examine the litany of case law, state and federal, interpreting the broad language of such constitutional provi-

sions as the due process and equal protection provisions and establishing standards on which to invoke the rights enshrined in those fundamental laws to reject the disingenuousness of the "absence-of-standards" rationale. If one were to take seriously this rationale, a huge portion of judicial constitutional review would be without basis. The dissent would invoke the words of Judge Robert Bork to insinuate that this court has succumbed to temptation in its headlong rush to judicial review excess, all the while ignoring that a constitution, whether state or federal, often

> states its principles in majestic generalities. . . .
>
> . . . .
>
> The role of a judge ... is to find the meaning of a text—a process which includes finding its degree of generality, which is part of its meaning—and to apply that text to a particular situation, which may be difficult if its meaning is unclear. . . . The problem is most difficult when dealing with the broadly stated provisions of the Bill of Rights. . . . In dealing with such provisions, a judge should state the principle at the level of generality that the text and historical evidence warrant.
>
> . . . .
>
> Original understanding [finds] the level of generality that interpretation of the words, structure, and history of the Constitution fairly supports. This is a solution generally applicable to all constitutional provisions as to which historical evidence exists.

Robert H. Bork, *The Tempting of America* 147–50 (The Free Press 1990).

[¶ 42] Judge Bork believes in, as we do, a "historically rooted" constitution. Judge Bork states:

> The provisions of the Constitution state profound but simple and general ideas. The law laid down in those provisions gradually gains body, substance, doctrines, and distinctions as judges, equipped at first with only those ideas, are forced to confront new situations and changing circumstances. It is essential, however, that the new developments always be weighed in the light of the lessons history provides about the principles meant to be enforced.

*Id.* at 352. For an illuminating and valuable history lesson on the Wyoming Constitution, *see* Robert B. Keiter and Tim Newcomb, *The Wyoming State Constitution* 1–28 (Greenwood Press 1993).

[¶ 43] The dissent ignores Judge Bork's counsel that

> [a]ll that counts is how the words used in the Constitution would have been understood at the time. The original understanding is thus manifested in the words used and in secondary materials, such as debates at the conventions, public discussion, newspaper articles, dictionaries in use at the time, and the like. Almost no one would deny this; in fact almost everyone would find it obvious to the point of thinking it fatuous to state the matter. . . .
>
> . . . .
>
> ... [L]awyers and judges should seek in the Constitution what they seek in other legal texts: the original meaning of the words.

Bork, *supra*, at 144–45. As the constitutional decisions of this court reveal, from *Rasmussen v. Baker*, 7 Wyo. 117, 50 P. 819 (1897), to the present, this court has heeded this counsel. In *Campbell I* in particular did this court analyze the words of the education provisions of our state constitution using a sound methodology of constitutional analysis to achieve the understanding of the text manifested in the words used and in secondary materials. The petitioners have challenged neither the analysis nor the resulting understanding. The proclamation that these words of the framers and ratifiers—the people—have no judicially discoverable meaning, commits the very heresy that Judge Bork condemns:

> The heresy, which dislocates the constitutional system, is that the ratifiers' original understanding of what the Constitution means is no longer of controlling, or perhaps of any, importance. . . . The result is a belief ... that judges may ... destroy old [principles], thus altering the principles actually to be found in the Constitution.

Bork, *supra*, at 6.

[¶ 44] Joining with his former federal court of appeals colleague in this condemnation, Justice Antonin Scalia has written:

Not that I agree with, or even take very seriously, the intricately elaborated scholarly criticisms to the effect that (believe it or not) words have no meaning. They have meaning enough, as the scholarly critics themselves must surely believe when they choose to express their views in text rather than music. But what *is* true is that it is often exceedingly difficult to plumb the original understanding of an ancient text. Properly done, the task requires the consideration of an enormous mass of material.... Even beyond that, it requires an evaluation of the reliability of that material.... And further still, it requires immersing oneself in the political and intellectual atmosphere of the time— somehow placing out of mind knowledge that we have which an earlier age did not, and putting on beliefs, attitudes, philosophies, prejudices and loyalties that are not those of our day. It is, in short, a task sometimes better suited to the historian than the lawyer.

Antonin Scalia, *Originalism: The Lesser Evil,* 57 Cincinnati L.Rev. 849, 856–57 (1989).

[¶ 45] Finally, to put a fine point on the subject, we are reminded of Judge Bork's counsel, after favorably offering *Brown v. Board of Education,* 347 U.S. 483, 492–95, 74 S.Ct. 686, 690–92, 98 L.Ed. 873 (1954), as a worthy example of a court correctly applying an old principle according to a new understanding of a social situation. He warned:

> The important thing, the ultimate consideration, is the constitutional freedom that is given into our keeping. A judge who refuses to see new threats to an established constitutional value, and hence provides a crabbed interpretation that robs a provision of its full, fair and reasonable meaning, fails in his judicial duty. That duty, I repeat, is to ensure that the powers and freedoms the framers [and ratifiers] specified are made effective in today's circumstances. The evolution of doctrine to accomplish that end contravenes no postulate of judicial restraint.

*Ollman v. Evans,* 750 F.2d 970, 996 (D.C.Cir. 1984) (Bork, J., concurring). This court's constitutional analysis in this on-going litigation contravenes no postulate of judicial restraint.

### Conclusion

[¶ 46] This court remains cognizant that just as all should recognize that our state's schools are the experts in providing an education to our children, all must recognize and rely upon the legislature's constitutionally granted authority and experience in designing and implementing our state's educational system. We refuse to believe that legislators do not consider our children's right to education as fundamental and important. Nor can we imagine that legislators will deliberately fail to uniformly assess through their chosen methodology the level of funds necessary to complete the capital construction goals identified through their plan and classified by this court as constitutionally required.

· [¶ 47] As the school districts and the legislature combine their efforts to implement the legislative plan for capital construction, these fundamental precepts apply. First, the State is responsible for funding capital construction of facilities to the level deemed adequate by state standards. Second, the Legislature is in control of the ultimate amount of spending as it exercises its responsibility of review and oversight of specific projects proposed by local school districts. Third, local school districts may supply revenue in excess of Legislative spending. Lastly, local bonded indebtedness is no longer required.

[¶ 48] The effort we all must maintain as citizens and officials is to remain focused on the very purpose those who created the constitution of this state sought: the adequate and equal opportunity for education of our children. When that purpose is given its proper place in our priority for our future as a state, open discussion of divergent points of view will inevitably lead to better resolution of issues in education. Our history must not be based on a legacy of school finance cases laid on the doorstep of the supreme court, but rather on the considerate resolution of never-ending challenges we all face as responsible adults when providing for our children.

VOIGT, Justice, dissenting.

[¶ 49]   I respectfully dissent.

[¶ 50]   The State's Petition for Rehearing raises five issues:

1.   The Court took judicial notice of partial or incomplete documents in arriving at the conclusion that Wyoming's legislative and executive branches have shirked their duties.   The Court should consider the complete documents which demonstrate significant progress and appropriations for capital construction.

2.   The Court's conclusion that scores of "... 90 or above for building condition, ... assure each facility achieves a rating of 'good'" is erroneous.   The consequences of that finding are significant.

3.   The ambiguous language of the opinion invites interpretation that the Court intended all buildings owned by school districts, regardless of use, achieve minimum MGT scores.

4.   In connection with the directive by the Court for the Legislature to expend $563 million (in 1998 dollars) on capital construction programs, the Court's premise that the State of Wyoming has the design and construction industry infrastructure to accommodate such a directive is questionable, and the consequences of the directive on the cost of constructing educational facilities and the potential adverse impact on the quality of work to be performed appear not to have been considered.

5.   The advisability of directing equal branches of Wyoming state government to adopt and implement specific policy prescriptions appears not to have been given the consideration it deserves.

I will direct my attention to the fifth issue because it should be dispositive of this case.

[¶ 51]   Wyoming is far from alone in its historic reliance upon local property taxes for education funding.   And Wyoming is far from alone in having had to come to grips with the resulting funding disparities.   By 1995, no less than thirty-three of the fifty states had addressed school finance in their state courts.   Peter Enrich, *Leaving Equality Behind: New Directions in School Finance Reform*, 48 Vand. L.Rev. 101, 185–94 (1995).   Commentators have recognized three "waves" of school finance litigation in the past several decades.   Before 1973, plaintiffs emphasized the equal protection clause of the United States Constitution.   During the second wave, lasting approximately from 1973 to 1989, the focus of such cases shifted to the education and equal protection clauses of the various state constitutions.   Finally, and continuing today, state court cases have centered on the education clauses of state constitutions.   Jennifer L. Fogle, Note, *Abbeville County School District v. State: The Right to a Minimally Adequate Education in South Carolina*, 51 S.C. L.Rev. 781, 789–90 (2000).

[¶ 52]   The shift from federal to state constitutional analysis had its genesis in a United States Supreme Court case:

Predictably, citizens suffering from inadequate and inequitable education finance sought redress in the courts.   While education finance questions have been litigated since at least 1912, the modern era of education finance begins in 1971 with *Serrano v. Priest*, [5 Cal.3d 584, 96 Cal.Rptr. 601, 487 P.2d 1241 (1971)]. The California Supreme Court relied on both the federal and state constitutions in holding that California's property wealth-based finance scheme violated the respective equal protection clauses.   The California Supreme Court's federal equal protection analysis regarding the Federal Constitution was negated, however, when the United States Supreme Court in *San Antonio Independent School District v. Rodriguez*, [411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973)] held that there is no fundamental right to education under the Federal Constitution.

The Supreme Court's opinion in *Rodriguez* was of great import.   First and foremost, the *Rodriguez* opinion expressly consigned the question of education finance to the states.   Second, the *Rodriguez* Court determined, five Justices to four, that education is not a fundamental right under the Federal Constitution for equal protection purposes.   By finding that education is not a fundamental right under the Federal Constitution, yet simultaneously recogniz-

ing the critical importance of education and urging states to address the problems of education finance, the Court presented state courts that would subsequently hear education finance cases with a textbook opportunity to fulfill the ideals of the new judicial federalism.

Michael D. Blanchard, *The New Judicial Federalism: Deference Masquerading as Discourse and the Tyranny of the Locality in State Judicial Review of Education Finance*, 60 U. Pitt. L.Rev. 231, 244–45 (1998) (footnotes omitted).[1]

[¶ 53] The importance of education to the citizens of Wyoming is reflected in the numerous references to public education in the Wyoming Constitution. Three sections are particularly pertinent to the present case. Wyo. Const. art. 1, entitled "Declaration of Rights," contains Section 23, entitled "Education," which reads as follows:

> The right of the citizens to opportunities for education should have practical recognition. The legislature shall suitably encourage means and agencies calculated to advance the sciences and liberal arts.

In Wyo. Const. art. 7, which is devoted wholly to education, two sections bear directly on the issues at hand:

§ 1. **Legislature to provide for public schools.**

> The legislature shall provide for the establishment and maintenance of a complete and uniform system of public instruction, embracing free elementary schools of every needed kind and grade, a university with such technical and professional departments as the public good may require and the means of the state allow, and such other institutions as may be necessary.

§ 9. **Taxation for schools.**

The legislature shall make such further provision by taxation or otherwise, as with the income arising from the general school fund will create and maintain a thorough and efficient system of public schools, adequate to the proper instruction of all youth of the state, between the ages of six and twenty-one years, free of charge; and in view of such provision so made, the legislature shall require that every child of sufficient physical and mental ability shall attend a public school during the period between six and eighteen years or a time equivalent to three years, unless educated by other means.

[¶ 54] It is in the interpretation and application of these constitutional mandates that the separate branches of Wyoming's government now are at loggerheads. It may or may not be comforting to know that neither the legislature nor the courts are "at fault" for this conflict. It is the natural result of the litigation spawned by local property tax funding of a state's school system. This realization should, perhaps, help to tone down some of the public rhetoric directed toward the litigants and the courts.

[¶ 55] The process whereby courts determine the constitutionality of statutes is called "judicial review."[2] Judicial review is now an accepted part of American jurisprudence, but that was not always the case.

Early constitutions preferred to give the lion's share of power to the legislature. In the light of American political history, this was only natural. The colonial governor— and the judiciary, to a certain extent— represented foreign domination. The assemblies, on the other hand, were the voice of local influentials. The Pennsylvania constitution of 1776 gave "supreme legisla-

---

1. Blanchard identifies this "new judicial federalism" as follows:

   Proponents of the new judicial federalism envision vigorous state constitutional protection of individual rights implicating an increase in the scope of judicial power among state courts. The new judicial federalism requires that the sphere of state courts' influence expand to compensate for the perceived restraint exercised by the federal judiciary, causing state courts to enhance their review of legislative measures under a revitalized state constitution. The new judicial federalism has thus stirred the coals of an old problem—the legitimate extent of judicial review—in the (renewed) context of state constitutional jurisprudence.

   Michael D. Blanchard, *supra,* 60 U. Pitt. L.Rev. at 232.

2. "The Courts become involved in executive or legislative functions only by virtue of judicial review." *State ex rel. Motor Vehicle Div. v. Holtz,* 674 P.2d 732, 742 (Wyo.1983).

tive power" to a single house of representatives. No upper house or governor's veto checked its power. Over the course of the years, however, the states became somewhat disillusioned with legislative supremacy. The governor was one beneficiary of this movement. Typically, he gained a longer term of office and the veto power (which the federal President had from the start). Judicial power, too, increased at the legislature's expense. Judicial power took the form called judicial review—review, through private litigation, of acts of other branches of government; with the right to declare these acts void, if, in the judges' opinion, they were unauthorized by the constitution. Judicial review fed on constitutional detail; the more clauses a constitution contained, especially clauses that did something more than merely set out the basic frame of government, the more potential occasions for the exercise of the power of review.

Lawrence M. Friedman, *A History of American Law* 106–07 (Simon and Schuster 1973) (footnote omitted).

[¶ 56] The boundaries of judicial review are not universally recognized or well defined, at either the state or the federal level. The following comments, though made about the United States Constitution, are equally applicable to the Wyoming Constitution:

The Framers, it is fair to say, failed to think through the power of judicial review and its ramifications for constitutional politics. * * *

* * * The Constitution, of course, is not self-interpreting and crucial principles—such as judicial review, separation of powers, and federalism—are presupposed rather than spelled out. Moreover, in creating separate institutions that share specific and delegated powers, the Constitution amounts to a prescription for political struggle and an invitation for an ongoing debate about enduring constitutional principles.

II David M. O'Brien, *Constitutional Law and Politics* 25 (W.W. Norton Co.1991). This struggle and debate began almost immediately after the constitutional convention as the fight over ratification was taken to the states. The following quotes, the first from Robert Yates, an opponent of the new constitution, and the second from Alexander Hamilton, a supporter of the new constitution, should help to place in historical perspective Wyoming's current controversy over the proper role of the judiciary:

Robert Yates:

"There is no authority that can remove [supreme court justices], and they cannot be controuled by the laws of the legislature. In short, they are independent of the people, of the legislature, and of every power under heaven. Men placed in this situation will generally soon feel themselves independent of heaven itself. . . .

And in their decisions they will not confine themselves to any fixed or established rules, but will determine, according to what appears to them, the reason and spirit of the constitution. The opinions of the supreme court, whatever they may be, will have the force of law; because there is no power provided in the constitution, that can correct their errors, or controul their adjudications. From this court there is no appeal."

Alexander Hamilton:

"Whoever attentively considers the different departments of power must perceive, that in a government in which they are separated from each other, the judiciary, from the nature of its functions, will always be the least dangerous to the political rights of the constitution; because it will be least in a capacity to annoy or injure them. The executive not only dispenses the honors, but holds the sword of the community. The legislature not only commands the purse, but prescribes the rules by which the duties and rights of every citizen are to be regulated. The judiciary on the contrary has no influence over either the sword or the purse, no direction either of the strength or of the wealth of the society, and can take no active resolution whatever. It may truly be said to have neither Force nor Will, but merely judgment; and must ultimately depend

upon the aid of the executive arm even for the efficacy of its judgments."

David M. O'Brien, *supra,* at 26.

[¶ 57] It is the interplay between judge and legislator—this constitutional separation of powers—that underlies the issues before this Court today. The general theme is clear: one branch of government should not exercise the powers of government belonging to another branch. That statement is clearly made in Wyo. Const. art. 2, § 1:

> The powers of the government of this state are divided into three distinct departments: The legislative, executive and judicial, and no person or collection of persons charged with the exercise of *powers properly belonging to one of these departments* shall exercise any *powers properly belonging to either of the others,* except as in this constitution expressly directed or permitted.

(Emphasis added.) The problem lies in the highlighted language: how do we determine what constitutional powers "properly belong" to one branch or another? In deciding where the line should be drawn between legislating, on the one hand, and judicial review, on the other, we should be mindful that differences of opinion have endured on this question for hundreds of years. Some cadre of judges in Wyoming did not create the concept of judicial review.

[¶ 58] As mentioned above, Wyoming is certainly not the first state to have faced this conflict in education finance litigation. It is not necessary to review every case across the nation where the separation of powers doctrine has been analyzed in the context of school finance reform.[3] Suffice it to say that the focus of the debate is often on the "political question doctrine." The central thesis of the political question doctrine is that some issues are not "justiciable;" that is, they are not capable of being determined by resort to legal principles in a court of law.

[¶ 59] The United States Supreme Court has identified several circumstances that indicate the existence of a non-justiciable political question:

> It is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962).[4] This Court has previously utilized these criteria to declare a lack of jurisdiction in the courts to determine a political question. *State ex rel. Schieck v. Hathaway,* 493 P.2d 759, 762–64 (Wyo.1972). We have also recognized the fine line that must be drawn to ensure the separation of powers when exercising judicial review:

> The disposition of the judicial branch of government has always been to scrupulously refrain from encroaching in the slightest way into the legislative field of policy making where factual or economic factors require latitude of discretion. We will not and we do not substitute our opinions in such matters for the considered judgment of our lawmakers. Yet, we ourselves have a function to perform, a constitutional right, and the paramount duty to insist that the legislature [not improperly delegate its power].

---

3. *See* Peter Enrich, *supra,* 48 Vand. L.Rev. 101.

4. School finance litigation has focused on the first two factors, and the discussion herein will also be so limited.

*Bulova Watch Co. v. Zale Jewelry Co. of Cheyenne,* 371 P.2d 409, 419 (Wyo.1962).

[¶ 60] The process of determining whether an issue is a non-justiciable political question begins with an interpretation of the constitutional text to determine whether and to what extent the issue is "textually committed" to another branch of government. *Nixon v. United States,* 506 U.S. 224, 228, 113 S.Ct. 732, 735, 122 L.Ed.2d 1 (1993). In the case of the Wyoming Constitution, both Sections 1 and 9 of Article 7 clearly delegate the establishment, maintenance and funding of Wyoming's schools to the legislature. *See* Michael Heise, *Schoolhouses, Courthouses, and Statehouses: Educational Finance, Constitutional Structure, and the Separation of Powers Doctrine,* XXXIII Land & Water L.Rev. 281, 304 (1998).[5] "These and other constitutional expressions should leave no doubt that the legislature has complete control of the state's school system in every respect[.]" *Washakie County School Dist. No. One v. Herschler,* 606 P.2d 310, 320 (Wyo.), *cert. denied,* 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28 (1980).

[¶ 61] The second circumstance found by the United States Supreme Court to involve a political question is the situation where there is "a lack of judicially discoverable and manageable standards for resolving" the issue. *Baker,* 369 U.S. at 217, 82 S.Ct. 691. That is precisely the situation now before this Court. Wyo. Const. art. 7, § 1 requires the legislature to provide "a *complete* and uniform system of public instruction," with free elementary schools of "every *needed* kind and grade," and a university with such technical and professional departments "as the *public good may require and the means of the state allow* ...." (Emphasis added.) Wyo. Const. art. 7, § 9 requires the legislature, by "taxation *or otherwise,*" to create and maintain "a *thorough and efficient*"

system of public schools, "*adequate to the proper instruction* of all youth...." (Emphasis added.) And finally, Wyo. Const. art. 1, § 23 provides that Wyoming's citizens' right "to opportunities for education should have *practical recognition.*" (Emphasis added.)

[¶ 62] These constitutional provisions do not provide judicially discoverable and manageable standards. It is not for this Court to *create* constitutional standards; we are only to *discover* ones that already exist. *City of Pawtucket v. Sundlun,* 662 A.2d 40, 57–59 (R.I.1995); *Abbeville County School Dist. v. State,* 335 S.C. 58, 515 S.E.2d 535, 541–42 (1999) (Moore, J., dissenting); *Seattle School Dist. No. 1 of King County v. State,* 90 Wash.2d 476, 585 P.2d 71, 119–130 (1978) (Rosellini, J., dissenting). In enacting school finance statutes, "the legislature must be free to remedy parts of a problem, or to recognize degrees of a problem and to formulate solutions in the areas it determines to be more in need or more readily corrected than others." *Lujan v. Colorado State Bd. of Educ.,* 649 P.2d 1005, 1026 (Colo.1982) (Erickson, J., specially concurring). If this Court "enacts" standards of its own, the legislature is deprived of the legislative discretion necessary to make the policy decisions assigned to it by the constitution.[6] Furthermore, the attempt to "manage" school finance in the courts by the enforcement of amorphous phrases such as "thorough and efficient" only leads to unending litigation:

> We point out one additional caveat: the absence of justiciable standards could engage the court in a morass comparable to the decades-long struggle of the Supreme Court of New Jersey that has attempted to define what constitutes the "thorough and efficient" education specified in that state's constitution. * * * [T]he New Jersey Su-

---

5. Interestingly enough, though Heise accurately notes that the education clauses of the Wyoming Constitution are "directed expressly to the legislature," he states that it "would be premature" to conclude that this "language amounts to a textual commitment to the legislative branch for political question doctrine purposes...." Michael Heise, *supra,* XXXIII Land & Water L.Rev. at 304. His hesitancy appears to rest on the fact that courts have the power of judicial review.

This circular reasoning simply avoids the *Baker* concepts. We know the power of judicial review exists; the question is whether it should be exercised.

6. For a thorough and thoughtful discussion of the potential ramifications of judicial legislating in the area of school finance, *see* Michael Heise, *supra,* XXXIII Land & Water L.Rev. 281.

preme Court has struggled in its self-appointed role as overseer of education for more than twenty-one years, consuming significant funds, fees, time, effort, and court attention. The volume of litigation and the extent of judicial oversight provide a chilling example of the thickets that can entrap a court that takes on the duties of a Legislature.

*City of Pawtucket,* 662 A.2d at 59.

[¶ 63] Most certainly, the allocation of resources toward competing needs is a legislative, not a judicial, function. Yet, in 1995, this Court issued the following mandate:

Because education is one of the state's most important functions, lack of financial resources will not be an acceptable reason for failure to provide *the best educational system. All other financial considerations must yield until education is funded.*

*Campbell County School Dist. v. State,* 907 P.2d 1238, 1279 (Wyo.1995) (emphasis added). We have now repeated that mandate in the instant case. *State v. Campbell County School Dist.,* 2001 WY 19, ¶ 138, 19 P.3d 518, 566 (Wyo.2001). There are several things wrong with this mandate. First, it is, pure and simple, judicial legislation. Second, "the best educational system" is not a standard that can be found anywhere in the constitution. Third, the spending dictates deprive the legislature of its right to identify and define "need," and of its right to balance competing societal interests. And finally, under Wyo. Const. art. 1, § 23, the right to education in Wyoming is to be given "practical recognition," which phrase does not suggest the extraordinary level of funding conceived by this Court.[7] While we may, when appropriate, review legislation for constitutionality, we may not order the legislature to set a standard at a particular level nor may we order the legislature to determine a standard using a particular methodology. *Davidson v. Sherman,* 848 P.2d 1341, 1349 (Wyo.1993).

[¶ 64] "When a court concludes that an issue presents a nonjusticiable political question, it declines to address the merits of that issue." *United States Dept. of Commerce v. Montana,* 503 U.S. 442, 457–58, 112 S.Ct. 1415, 1425, 118 L.Ed.2d 87 (1992).

In invoking the political question doctrine, a court acknowledges the possibility that a constitutional provision may not be judicially enforceable. Such a decision is of course very different from determining that specific [legislative] action does not violate the Constitution. That determination is a decision on the merits that reflects the *exercise* of judicial review, rather than the *abstention* from judicial review that would be appropriate in the case of a true political question.

*Id.* (emphasis in original and footnotes omitted). Stated otherwise, a court that invokes the political question doctrine does not tell the legislature, "this statute is constitutional;" rather, the statement made is "we decline to exercise the power of judicial review of this statute because the issue is non-justiciable." The result is the same in that the statute is not declared unconstitutional. *See State ex rel. Schieck,* 493 P.2d at 764 (court's refusal, based on political question doctrine, to review qualifications of person to serve in legislature does not mean the court has ruled on the qualification issue itself).

[¶ 65] The principle of *stare decisis* requires that I discuss at least briefly the history of education finance reform in Wyoming.[8] There are four cases that deserve mention.[9] In 1971, this Court relied on *Serrano v. Priest,* 5 Cal.3d 584, 96 Cal.Rptr. 601, 487 P.2d 1241 (1971), *cert. denied,* 432 U.S.

---

7. There may be one more concern with this mandate. Social scientists continue to debate whether there is a connection between educational spending and educational equity. *See* Michael Heise, *supra,* XXXIII Land & Water L.Rev. at 291–93.

8. The term *"stare decisis"* is a Latin phrase meaning "to stand by things decided." It refers to the "doctrine of precedent, under which it is necessary for a court to follow earlier judicial decisions when the same points arise again in litigation." Black's Law Dictionary 1414 (7th ed.1999).

9. Two others do not bear directly on the issues at hand. *See Campbell County School Dist. v. Catchpole,* 6 P.3d 1275 (Wyo.2000) and *Lincoln County School Dist. No. One v. State,* 985 P.2d 964 (Wyo.1999).

907, 97 S.Ct. 2951, 53 L.Ed.2d 1079 (1977) and the equal protection clause of the United States Constitution to invalidate a proposed school district reorganization. *Sweetwater County Planning Committee for Organization of School Districts v. Hinkle*, 491 P.2d 1234, 1238 (Wyo.1971). While recognizing the separation of powers doctrine, the court went on to suggest a detailed "possible method by which equal and uniform taxes can be accomplished for school purposes," even going so far as to retain jurisdiction over the case until the next legislative session. *Id.* at 1237. Two years later, in *Johnson v. Schrader*, 507 P.2d 814, 816 (Wyo.1973), this Court once again cited *Serrano* and the right to equal protection in rejecting Goshen County's school district reorganization plan because it would have resulted in grossly unequal property valuations between districts. Ironically, the power of judicial review was not mentioned by the majority, but by Justice McIntyre in dissent, where he opined that, in accepting the state committee's reorganization plan, the court had made "a nullity of judicial review." *Id.* at 820 (McIntyre, J., dissenting).

[¶ 66] Wyoming's next school finance case noted that, since *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), reliance on the equal protection clause of the federal constitution was no longer appropriate, so the court's equal protection analysis was done under the state constitution.[10] *Washakie County School Dist. No. One*, 606 P.2d at 319. Though *Washakie County School Dist. No. One*, 606 P.2d at 317, rejected nonjusticiability and the political question doctrine, it did so not through application of the *Baker* factors, which are relevant, but through the declaratory judgment analysis of a Wyoming state case, *Brimmer v. Thomson*, 521 P.2d 574, 578 (Wyo.1974).[11] The *Brimmer* factors, focusing as they do on the "gen-

uineness" of the controversy, and not on the constitutional separation of powers, are not well-suited for analysis of an issue under the political question doctrine.

[¶ 67] Fifteen years after *Washakie County School Dist. No. One*, this Court once again rejected separation of powers concerns in finding the state's school finance scheme unconstitutional. *Campbell County School Dist.*, 907 P.2d at 1264–65. This time, referring neither to *Baker* nor to *Brimmer*, this Court relied instead on a straightforward assertion of the right to judicial review:

> "The judiciary has the ultimate power, and the duty, to apply, interpret, define, construe all words, phrases, sentences and sections of the [Wyoming] Constitution as necessitated by the controversies before it. It is *solely* the function of the judiciary to so do. This duty must be exercised even when such action serves as a check on the activities of another branch of government or when the court's view of the constitution is contrary to that of other branches, or even that of the public."

*Campbell County School Dist.*, 907 P.2d at 1264–65 (emphasis in original) (*quoting Rose v. Council for Better Educ., Inc.*, 790 S.W.2d 186, 209 (Ky.1989)).

[¶ 68] In authoring this dissent, I am not taking a position one way or the other on the constitutionality of the state's school funding system. Nor should anyone conclude from this dissent that I am against any particular level of school funding. The decision is not mine to make.

Although we may personally favor it, it is not this court's place to order the General Assembly to give education "high priority" in its budget allocations, any more than it is our place to set policy or prioritize the allocation of funds to other state programs. Members of the legislative branch represent the collective will of the citizens of

---

**10.** See the definition of the "new judicial federalism" in Michael D. Blanchard, *supra*, 60 U. Pitt. L.Rev. at 232.

**11.** Wyo. Stat. Ann. § 1–37–103 (LexisNexis 2001) provides as follows:

> Any person interested under a deed, will, written contract or other writings constituting a contract, or whose rights, status or other

legal relations are affected by the Wyoming constitution or by a statute, municipal ordinance, contract or franchise, may have any question of construction or validity arising under the instrument determined and obtain a declaration of rights, status or other legal relations.

 

Ohio, and the manner in which public schools are funded in this state is a fundamental policy decision that is within the power of its citizens to change. Under our system of government, decisions such as imposing new taxes, allocating public revenues to competing uses, and formulating educational standards are not within the judiciary's authority. As noted by the United States Supreme Court in *Rodriguez*, "the ultimate solutions [to perceived problems associated with school funding systems] must come from the lawmakers and from the democratic pressures of those who elect them." *Id.*, 411 U.S. at 59, 93 S.Ct. at 1310, 36 L.Ed.2d at 58.

*DeRolph v. State*, 78 Ohio St.3d 193, 677 N.E.2d 733, 786 (1997) (Moyer, C.J., dissenting).

[¶ 69] After concluding that the state's school finance system was unconstitutional in that it did not provide for a thorough and efficient system of schools, the majority in *DeRolph* made the following comment:

> In reaching this conclusion, we dismiss as unfounded any suggestion that the problems presented by this case should be left for the General Assembly to resolve. ***This case involves questions of public or great general interest over which this court has jurisdiction.***

*Id.* at 737 (emphasis added). The fallacy with this reasoning is that an issue's justiciability is not determined by its level of "public or great general interest." It might even be said that, the higher the level of public interest, the more likely the issue may involve political and policy decisions. It is in this arena that judges must be most careful:

> In law, the moment of temptation is the moment of choice, when a judge realizes that in the case before him his strongly held view of justice, his political and moral imperative, is not embodied in a statute or in any provision of the Constitution. He must then choose between his version of justice and abiding by the American form of government. Yet the desire to do justice, whose nature seems to him obvious, is compelling, while the concept of constitutional process is abstract, rather arid, and the abstinence it counsels unsatisfying. To give in to temptation, this one time, solves an urgent human problem, and a faint crack appears in the American foundation. A judge has begun to rule where a legislator should.

Robert H. Bork, *The Tempting of America: The Political Seduction of the Law* 1 (The Free Press 1990). The duty to follow the constitution by recognizing the separate realm of the legislature must outweigh the principle of "following precedent." The fact that this Court has previously ruled where it should not does not justify doing so again.

[¶ 70] The issues presented to this Court in the State's Petition for Rehearing are nonjusticiable political questions that should be left to the legislature. The issues being political, rather than judicial, the remedies should also be political, rather than judicial. If the people do not believe that the legislature is providing a thorough and efficient public school system, their displeasure should be registered in the voting booth, not in the office of the clerk of court.